**Law Offices of Babak Naficy**
Babak Naficy (SBN 177709)
babaknaficy@sbcglobal.net
890 Monterey Street, Suite H
San Luis Obispo, CA 93401
Telephone: (805) 593-0926
Facsimile: (805) 593-0946

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| **FRIENDS OF THE BIG BEAR VALLEY**, a nonprofit association; **JOHN MUIR PROJECT OF EARTH ISLAND INSTITUTE**, a nonprofit corporation; **SAN BERNARDINO VALLEY AUDUBON SOCIETY**, a nonprofit corporation, | **Case No.:** 5:23-cv-1609 |
| | **COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF** |
|     Plaintiffs, | |
|     vs. | Administrative Procedure Act, 5 U.S.C. § 551, *et seq*.; National Environmental Policy Act, 42 U.S.C. § 4321, *et seq*. |
| **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture; **FREDDIE DUNCAN**, District Ranger, Mountaintop Ranger District, San Bernardino National Forest, in his official capacity, | |
|     Defendants | |

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF - 1

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2412 (costs and fees). Plaintiffs seek judicial review of final agency actions of the United States Forest Service, as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 704 (actions reviewable).

2.     Venue is properly rested in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the events or omissions giving rise to the claims occurred in this district, primarily in San Bernardino County.

**INTRODUCTION**

3.     Plaintiffs Friends of Big Bear Valley, John Muir Project of Earth Island Institute, and San Bernardino Valley Audubon Society (collectively "Plaintiffs") challenge Defendant United States Forest Service's ("USFS") Decision Notice/Finding of No Significant Impact ("DN/FONSI") approving the North Big Bear Landscape Restoration Project ("North Big Bear Project" or "Project"). Defendant Freddie Duncan ("Duncan" or collectively with USFS "Defendants" or "Forest Service") signed the DN/FONSI on May 1, 2023. Plaintiffs bring this challenge on the grounds that the DN/FONSI (1) violates the National Environmental Policy Act ("NEPA") and its implementing regulations,

(2) violates the USFS's objection regulations, and (3) violates the National Forest Management Act ("NFMA") and its implementing regulations.

4.      According to the Forest Service, the stated purpose of the Project is to curb wildfire behavior to protect adjacent human communities, while improving forest health and wildlife habitat, by removing many trees in forests which the Forest Service asserts are unnaturally and excessively dense.

5.      To accomplish the stated goal, the Project as approved will involve a significant amount of "fuel reduction," which is a euphemism for tree and vegetation removal by means of prescribed burns as well as mechanical and/or hand removal of trees and other vegetation. The Environmental Assessment ("EA") and other Project documents do not clearly state what the Forest Service intends to do with the thousands of trees that they propose to cut down, including whether the Forest Service plans to skin and haul the logs with industrial ground-based logging machinery. The EA also fails to describe the soil and vegetation impacts associated with such activities.

6.      Prescribed fires are intentionally set fires that are planned, managed, and monitored for temperature, humidity, wind, vegetative

moisture, and smoke dispersal by the Forest Service. Prescribed fires also include "broadcast burning" which is the process of setting fire to most or all of an area within well-defined boundaries for the stated purpose of reducing fuel hazards and managing biological resources, or both. The Project documents state that the Project activities, including widespread tree cutting, ground disturbance, and prescribed fires adjacent to homes would occur over the duration of 15 to 20 years (EA, p. 22) on more than 13,000 acres of forest. Yet the Forest Service claims Project implementation will not result in any potentially significant impacts. Recently, the Forest Service has acknowledged that the agency's prescribed fires, including broadcast burns and pile burning (i.e., burning of branches on the ground after thinning), has caused multiple escapes of such prescribed fires, which in turn has led to the destruction of large portions of adjacent human communities.

7.     According to the DN/FONSI, an area of at least 1,200 acres but not to exceed 2,000 acres would be subject to prescribed burns annually within the proposed action area, adjacent to human communities. The burns would occur in 100-to-600-acre blocks as a daily prescribed burn during appropriate seasons. Prescribed burns adjacent to riparian areas would be conducted within a 500-foot buffer

when vegetation fuel contains high moistures levels to protect willows or other riparian shrubs and trees. Each of the project area watersheds would be subject to prescribed burns up to 1,000 acres every 3 years.

8.    The Project's proposed fuels management also includes vegetation thinning in the form of timber removal using mechanical and hand thinning techniques. "Forest thinning" reduces the number of trees by cutting and removing them from the forest. The Forest Service's theory justifying this activity is that reducing the number of trees could result in lower intensity wildfires or prescribed burns and ultimately reduce wildfire risk.

9.    The Forest Service proposes to cut and remove trees using heavy equipment such as bulldozers, cranes, and woodchippers, a process which would result in soil disturbance and compaction. Tree removal activities would also include crews using chainsaws, rakes, and manually removing forest debris from the Project area.

10.    Vegetation thinning within riparian conservation areas ("RCA") could reduce riparian ground cover, e.g., rocks, stumps, branches, leaves, litter, duff, and living plants less than 5 feet tall, by up to 30 percent of naturally occurring cover within the Project area. The total vegetation thinning in watersheds within the Project area

would include up to 600 acres of mechanical thinning every 5 years. It is not clear if nonmechanical thinning or vegetation removal can exceed this limit.

11.     Through these efforts, the Forest Service purports to restore forests within the Project area to pre-settlement conditions and thereby curb fire behavior, despite highly controversial and uncertain evidence and impacts, including: (1) the controversy surrounding the purported evidence that pre-settlement forests were much less dense than today's conditions, including the fact that the Forest Service's own evidence shows that current forests in the North Big Bear Project area are substantially less dense, not more dense, than historical forests; (2) the controversy created by the existence of abundant scientific evidence (submitted to the Forest Service by Plaintiffs during the comment period), including studies by Forest Service scientists, which concluded that forest fires are driven mainly by weather and climate factors and that mechanical thinning changes the microclimate of forests, creating hotter, drier, windier conditions, and promoting the growth and spread of highly combustible invasive grasses, all of which tends to increase rather than decrease the rate of spread and overall severity in fires; (3) the controversy created by the existence of abundant scientific evidence

from scientists, including the Forest Service's own scientists, concluding that thinning and other vegetation management in forests distant from homes does not stop fires from reaching communities and in fact often makes fires spread faster toward communities, thus increasing threats to public safety, while defensible space pruning (not logging) within 100 or 200 feet of private properties is highly effective in protecting homes and lives; (4) the controversy created by the potential for fires set by the Forest Service to escape and destroy nearby communities; and (5) the controversy regarding the adverse impacts that the Project would have on an established Bald Eagle nest location, as pointed out by the over 1,000 comments submitted by the public expressing deep concern regarding the degradation of habitat and noise disturbance impacts of the Project to nationally famed Bald Eagles within the Project area, including areas used by Bald Eagles far from the nest site.

12.    The last time the San Bernardino National Forest pursued the same approach represented by the North Big Bear Project was in the early to mid-2000s, prior to the Grass Valley wildfire of 2007. This fire rapidly swept through the areas that had been thinned and burned down 199 homes—an outcome that the Forest Service's own scientists blamed on the agency's failure to focus on the homes and the immediate

vicinity adjacent to homes, as opposed to distant forest wildlands. In its Response to Comments document, the Forest Service ignored this evidence and the importance of pursuing the activities known to actually protect public safety from fires, dismissively rejecting consideration of this science by disingenuously claiming that focusing on the safety of adjacent communities is "beyond the scope" of the Forest Service's consideration (EA, App. C (Response to Comments) at p. 9). Furthermore, the North Big Bear Project EA and associated documents and reports did not meaningfully or adequately address the potential for the Project to increase the risk to public safety from wildfires or prescribed fires set by the Forest Service adjacent to communities, and the potential for escape of such fires toward homes.

13.    The Forest Service's analysis of the impacts from this Project and the decision to approve the Project based on an EA violates NEPA and established Ninth Circuit precedent by, among other things, failing to prepare an Environmental Impact Statement ("EIS") in the face of a highly controversial debate about the fire outcomes resulting from mechanical thinning. BARK v. U.S. Forest Service, 958 F.3d 865 (9th Cir. 2020).

14.     In order to prevent the Forest Service from logging in ways that will increase fire threats to adjacent human communities, degrade forests that provides essential wildlife habitat, and result in violations of the Forest Service's duties under NEPA, Plaintiffs seek from this Court an order and judgment:

a. Declaring that the Forest Service's DN/FONSI for the Project violates NEPA, 42 U.S.C. § 4321, et seq., and is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the APA, 5 U.S.C. § 706(2)(A);

b. Vacating and setting aside the Forest Service's DN/FONSI as an illegal agency action under the APA;

c. Permanently enjoining the Forest Service from implementing the North Big Bear Project until the agency complies with NEPA, USFS Objection regulations, and NFMA;

d. Enter appropriate injunctive relief to ensure that Defendants comply with NEPA and specifically to ensure that Defendants and their agents take no further actions toward proceeding with the challenged Project until they have complied with NEPA;

e.  Awarding Plaintiff its reasonable attorneys' fees and costs
pursuant to the Equal Access to Justice Act, 28 U.S.C. §
2412; and

f.  Awarding such further relief as the Court deems just and
equitable.

## PARTIES

15.   Plaintiff JOHN MUIR PROJECT is a private organization
with a longstanding interest in the protection of national forests. John
Muir Project is a project of the EARTH ISLAND INSTITUTE ("EII"),
which is a nonprofit corporation organized under the laws of the State
of California. EII is headquartered in Berkeley, California. EII's mission
is to develop and support projects that counteract threats to the
biological and cultural diversity that sustains the environment.
Through education and activism, these projects promote the
conservation, preservation, and restoration of the earth. One of these
projects is the John Muir Project, whose mission is to protect all federal
public forestlands from commercial exploitation that undermines and
compromises science-based ecological management. The John Muir
Project offices are located in San Bernardino County, California. EII is a
membership organization with over 15,000 members in the United

States, over 3,000 of whom use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes.

16.    The John Muir Project and EII's members include individuals who regularly use public lands throughout the San Bernardino National Forest—and specifically Mountaintop District—for scientific study, recreational enjoyment, aesthetic beauty, and nature photography. These members' interests will be irreparably harmed by the planned logging because they will no longer be able to scientifically study these areas in their current state, take nature photographs of the area in its current state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

17.    Plaintiff FRIENDS OF BIG BEAR VALLEY ("Friends") is a non-profit association whose headquarters are in Fawnskin, California, on the south side of Big Bear Lake. Friends is actively involved in species and habitat protection issues in and around Big Bear Lake and has more than 11,000 members and over 850,000 followers/subscribers, including many members who reside and recreate in and around Big Bear Lake. One of Friends' primary missions is to protect and restore

habitat and populations of imperiled species, including from the impacts of forest management practices that harm the environment.

18.    Friends' members and staff include individuals who regularly use and intend to continue to use the San Bernardino National Forest, specifically Mountaintop District. These members and staff use the area for observation, research, aesthetic enjoyment, spiritual practice, and other recreational, scientific, spiritual, and educational activities. Friends' staff and members use the area to enjoy its character and to observe or study species, including the Bald Eagle, which inhabits the area and/or uses it for foraging. These members' interests will be irreparably harmed by the planned logging in the Project area because they will neither be able to visit and enjoy this area in its current state any longer, nor be able to observe or attempt to observe the species which use and are dependent on these areas in their current state.

19.    Plaintiff SAN BERNARDINO VALLEY AUDUBON SOCIETY ("SBVAS") is a nonprofit corporation organized under the laws of the State of California. SBVAS, with a membership of over 1,700, strives to bring people to their natural environment. Focusing on birds and other wildlife, they hope to conserve natural resources in the

Southern California's "Inland Empire," specifically San Bernardino, Riverside, and Imperial Counties. Founded in 1948, SBVAS is southeastern California's leading non-profit engaging people in the conservation of birds and their habitats. SBVAS involves people through recreational birding, education programs, and conservation actions from counting birds to working with local, state, and national policy makers.

20.    This suit is brought by Friends, the John Muir Project of EII, and SBVAS on behalf of themselves and their adversely affected members and staff. Plaintiffs have an organizational interest in the proper and lawful management of the San Bernardino National Forest, specifically Mountaintop District. Plaintiffs' and their members' present and future interests in the use of the Mountaintop District area are and will be directly and adversely affected by the challenged decision. Those adverse effects include, but are not limited to: (1) endangering public safety from wildfires and prescribed fires; (2) harm to iconic Bald Eagle nest and foraging and roosting sites; (3) harm to wildlife, including protected species, and degradation of their habitats within and around the Project area from proposed fuel reduction activities; (4) reduction and impairment of recreation opportunities; (5) impaired spiritual and

aesthetic values of forest lands, trails, and landscapes caused by Defendants' tree and vegetation removal and related activities; and (6) loss of scientific investigation and observation opportunities with regard to wildlife in areas proposed for logging. In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, NFMA, and other federal laws. Because Defendants' actions approving the Project violate the law, a favorable decision by this Court will redress the actual and imminent injury to Plaintiffs.

21.    Plaintiffs have participated extensively in administrative actions to protect their interests within the San Bernardino National Forest. Friends, John Muir Project, and SBVAS actively participated in the administrative review process by submitting substantive comments and objections. The Plaintiffs have exhausted any and all available administrative remedies.

22.    Pursuant to 5 U.S.C. §§ 702 and 704, a reviewable final agency action exists and is subject to this Court's review.

23.     Defendant FOREST SERVICE is an agency of the United States and is a division of the Department of Agriculture charged with managing the public lands and resources of the San Bernardino National Forest in accordance with NEPA and NFMA and their implementing regulations.

24.     Defendant FREDDIE DUNCAN, District Ranger for Mountaintop Ranger Districts, approved the North Big Bear Landscape Restoration Project in the San Bernardino National Forest and signed the DN/FONSI. The DN/FONSI is the Forest Service's final agency action regarding the North Big Bear Landscape Restoration Project.

25.     Defendant Duncan is sued only in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act (42 U.S.C. § 4321, *et seq.*)

26.     Congress enacted the National Environmental Policy Act ("NEPA") in 1969. NEPA's primary purposes are to ensure fully informed decision-making and to provide for public participation in environmental analysis and decision-making. 40 C.F.R §§ 1500.1(b) & (c). To this end, NEPA directs all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment.

27.     The Council on Environmental Quality ("CEQ") promulgates uniform regulations to implement NEPA. These regulations are binding on all federal agencies and can be found at 40 C.F.R. §§ 1500–1518.4.

28.     The CEQ regulations require federal agencies to adopt procedures to implement NEPA that supplement the CEQ regulations. 40 C.F.R. § 1507.3. The USFS's NEPA procedures can be found at 36 C.F.R. §§ 220.1–220.7.

29.     NEPA requires all federal agencies to prepare a "detailed statement," referred to as an Environmental Impact Statement ("EIS"), assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

30.     Alternatively, an agency may instead prepare an Environmental Assessment ("EA") to help determine whether or not a proposed activity will significantly affect the quality of the human environment. An EA is "a concise public document for which a federal agency is responsible." 40 C.F.R. § 1508.9(a). The EA needs to include sufficient evidence and analysis in order to determine whether an EIS or a Finding of No Significant Impact ("FONSI") is required. 40 C.F.R. § 1508.9, *see also* 36 C.F.R. § 220.7(b)(3)(i).

31.    The scope of NEPA's review of environmental effects is broad; the agency must consider direct, indirect, and cumulative effects. 40 C.F.R. § 1508.8 (defining the term "effects" and explaining that it includes indirect effects and is synonymous with "impacts"). Effects include consideration of impacts on "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" interests. *Ibid.*

32.    Under USFS's applicable NEPA regulations, the approval of the North Big Bear Project triggered NEPA requirements, and the need to prepare an EA, at least initially, and ultimately an EIS. 36 C.F.R. § 220.7(a).

33.    Agency actions taken pursuant to NEPA are reviewable by this Court under the APA. 5 U.S.C. §§ 702, 704, & 706.

## *EA Requirements*

34.    All EAs must include (1) a description of the need for the project, (2) a description of the proposed action and alternative(s), (3) a discussion of the environmental impacts of the proposed actions and alternative(s), and (4) a note of the agencies and persons who were consulted throughout the process. 36 C.F.R. § 220.7(b). Importantly, an

EA needs to "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]". 40 C.F.R. § 1508.9(a)(1). Public scrutiny is essential to implementing NEPA. 40 C.F.R. § 1500.1(b). NEPA requires agencies to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. 40 C.F.R. § 1506.6(a). NEPA procedures ensure that environmental information will be made available to public officials and citizens before decisions are made and actions are taken. 40 C.F.R. § 1500.1(b).

35.    NEPA requires that all agencies "study, develop, and describe appropriate alternatives to recommend courses of action." 42 U.S.C. § 4332(2)(E). This requirement "extends to all such proposals, not just . . . [environmental] impact statements." 40 C.F.R. § 1507.2(d). The EA shall also provide sufficient evidence and analysis of the environmental impacts of the proposed action, as well as the alternative(s). 36 C.F.R. § 220.7(b)(3)(i).

36.    NEPA requires agencies to take a hard look at the environmental consequences before taking a major action. This includes considering all foreseeable direct and indirect impacts, as well as cumulative impacts.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37.     To determine the significance of a federal action, CEQ regulations require agencies to look to both the context and intensity of the action. 40 C.F.R. § 1508.27. Context refers to the significance of the action in regards to society as a whole, the affected region, the affected interests, and the locality. Both short- and long-term effects are relevant to the action's context. 40 C.F.R. § 1508.27(a). The intensity of the action is evaluated based on several factors, including, but not limited to, the degree to which the possible effects on the human environment are highly controversial or uncertain or involve unknown characteristics or risks, the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration, whether the action is related to other actions with individually insignificant but cumulatively significant impacts, and the degree to which an action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act. 40 C.F.R. § 1508.27(b). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7).

38.    Accurate scientific analysis is essential to NEPA implementation. 40 C.F.R. § 1500.1(b).

39.    NEPA documents need to be written in plain language so that decisionmakers and the public can readily understand them. Documents are unacceptable if they are indecipherable to the public.

40.    After completing an adequate EA, the agency shall prepare either an EIS or a FONSI. An agency must prepare an EIS when it makes a determination that the action has the potential to significantly affect the natural or human environment. 36 C.F.R. § 220.6(c).

41.    A FONSI will be prepared if the action causes no significant effect to the environment; but the agency must provide a convincing statement of reasons to explain how the impacts are insignificant. 40 C.F.R. § 1508.13.

***United States Forest Service Project-Level Predecisional Administrative Review Process Regulations (36 C.F.R. Pt. 218)***

42.    The USFS provides regulations establishing a predecisional administrative review (also known as objection) process for proposed actions of USFS projects. 36 C.F.R. § 218.1.

43.    Objections are written documents seeking predecisional administrative review of a proposed project implementing a land

management plan that are documented with an EA. They can be filed by those who have submitted written comments to the specific project during the commenting opportunity. 36 C.F.R. § 218.2.

44.    These regulations note that certain projects are subject to legal notice and the opportunity to comment; among these are projects for which a revised EA is prepared based on consideration of new information or changed circumstances. 36 C.F.R. § 218.22(d). This not only provides the public with an opportunity to comment but ensures that the right to file an objection is maintained for those who comment. 36 C.F.R. § 218.5.

### *Administrative Procedure Act (5 U.S.C. § 551 et seq.)*

45.    Section 702 of the APA provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

46.    Under section 704 of the APA, only "final agency actions" are reviewable. 5 U.S.C. § 704. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow. Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

47.     Under section 706 of the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). In reviewing an agency's finding that a project has no significant effects, courts must determine whether the agency has met NEPA's hard look requirement, "based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." BARK v. United States Forest Service, 958 F.3d 865, 869 (9th Cir. 2020).

### SUMMARY OF PERTINENT FACTS

48.     As explained in the June 2023 Final EA, the Forest Service claims that implementation of the Project will:

1) Reduce risks to firefighters, communities, infrastructure, air quality, and watershed integrity due to uncharacteristically large or severe wildfires;

2) Reduce fire behavior directly adjacent to communities and infrastructure to prevent undesirable fire effects;

3) Restore historic fire patterns and frequencies at the landscape scale and minimize the potential for

uncharacteristically large or severe wildfires, or vegetation type conversion resulting from extensive mortality outside the range of natural variability;

4) Restore historic vegetation heterogeneity across the project area to improve native plant and wildlife habitat by moving species composition mix to conditions more like pre-settlement composition;

5) Restore and protect habitats for rare and sensitive plant and wildlife species;

6) Reduce drought stress to trees, and potential for uncharacteristically severe insect infestation due to vegetation densities exceeding the natural range of variation;

7) Maintain roads and trails to Forest Service standards to prevent erosion and impacts to vegetation;

8) Reduce road density to improve watershed conditions and achieve travel management objectives; and

9) Rehabilitate undesired user-created roads and trails with native vegetation.

49.     According to the Forest Service, "[p]rescribed fire, including broadcast, pile, and jackpot burning may occur over the entire project area, except pebble plains. In general, prescribed fire occurs between the months of November and June." (EA, p. 5).

- Broadcast burning, or burning surface fuels, small plants, shrubs and small trees, would occur in plant community types that historically had low-severity and mixed-severity fire regimes such as yellow pine and mixed conifer, meadow, and sagebrush ecosystems. Broadcast burning may occur as a stand-alone treatment where fuels are optimal to support low to moderate intensity fire, or may occur post-mechanical thinning. Broadcast burning is expected to be a continuous and ongoing treatment. The timing of broadcast burning would be dependent on a combination of factors including vegetation response, fuels conditions, weather conditions, availability of resources and is expected to occur with a frequency of 4-10 years per broadcast burn unit.

- Pile burning is burning of slash piles, usually limbs, shrubs and small trees, after mechanical treatments. Pile

burning may occur intermittently after mechanical treatment for maintenance of fuel breaks within pinyon-juniper ecosystems.

- Thinning would include hand and mechanical treatments. Hand thinning treatments would occur in areas where slope exceeds 35%, or where there is a significant concern about impacting cultural resources, sensitive plant, soil conditions, or wildlife species and habitat. Variable density thinning, including creation of clumps of trees, widely spaced individual trees, and canopy openings for structural diversity, will occur in yellow pine and mixed conifer stands where stand density is high.

- Thinning to a canopy spacing of approximately 17 trees per acre would occur in pinyon-juniper and mountain mahogany dominated stands within the Wildland Urban Interface (WUI) defense zone to a distance of 300' from structures, private lands, infrastructure and egress routes. Within the WUI defense zone large shrubs may be topped to 2' in height to maintain lower flame lengths. It is expected the overstory thinning will be a one-time

treatment. Removal of small trees and shrubs may occur as needed to maintain treatment effectiveness.

- Within un-occupied California spotted owl protected activity centers (PACs) hand-thinning of understory white fir may occur to reduce fire behavior. White fir thinning is anticipated to be a one-time treatment limited to unoccupied PACs and will be maintained by prescribed fire. No thinning is planned in occupied PACs.

- Within canyon live oak dominated stands, canyon live oak would be pruned to avoid aggressive resprouting.

- Canopy openings of up to 1 acre in pinyon-juniper dominated stands may be created in post-settlement colonized stands, located where advantageous to fire suppression up to 1/3 of pinyon-juniper dominated stands.

- Removing conifers established post-settlement from meadows and pebble plains. (EA, pp. 5-7).

50.   The EA admits that "[a]pplication of prescribed fire has the potential to induce fire-based mortality upon residual trees due to scorching of the bole, crown, and/or root system." (EA, p. 18).

51.    A 30-day scoping process was commenced on September 3, 2020. The Forest Service circulated a Draft Final Environmental Assessment ("EA") in September 2021 thereby commencing a 30-day comment period. The Service received nearly 1,500 comments, which for the most part expressed concerns about the Project's impact on the bald eagles and their habitat.

52.    A Final EA was circulated for a 45-Day objection period in June 2022. The Service received 89 Objections. Notwithstanding the Objections, the Reviewing Office determined that the District Ranger could proceed with issuing the DN/FONSI.

53.    Pursuant to the instructions of the Reviewing Officer, e-bike trails were removed from the final action and analysis of new trail construction was deferred.

54.    The EA and DN/FONSI concluded that an environmental impact statement ("EIS") was not needed because the Project's impacts, both short and long term, are not significant.

55.    Plaintiffs reallege and incorporate by reference all preceding paragraphs into each of the claims for relief set forth below.

## CLAIM FOR RELIEF 1

### (Failure to Ensure Scientific Accuracy and Integrity)

56.     Accurate scientific analysis is essential to NEPA implementation. 40 C.F.R. § 1500.1(b). Moreover, an agency needs to set forth its reasoning clearly enough to permit the public to meaningfully and constructively comment. It is fundamental that the public be given an indication of what the agency proposes to do.

57.     The EA contains several inaccuracies and misstatements that undermine the Forest Service's conclusion that the Project will not result in any significant impacts on the environment. For example, Land Management Plan ("LMP") Standard S18 requires protection of known raptor nest trees "including not treating the areas within ¼-mile of bald eagle habitat during the period when the most eagles are present (December 1 to April 1)." EA, p. 29. However, as Friends noted in their Objection, contrary to the statement in the EA, bald eagles are present in Grout Bay and utilize the same nest year-round. Friends warned that "If mechanical thinning and prescribed fires are continued in the nest area up to January, the eagle pair will most likely abandon the nest since their nesting activities would be interrupted." (Friends comments on EA).

58.     Similarly, the Biological Evaluation ("BE")—on which the EA relies—assumes that the eagles' nesting period begins in January,

ignoring the detailed documentation Friends provided with its comments demonstrating that each year the eagle pair begins nesting activities in early October. Elsewhere, the BE incorrectly claims that the "timing of nesting in the San Bernardino Mountains is not documented," ignoring the fact that the timing of the resident bonded eagle pair in Grout Bay has been carefully observed and that the timing of the initiation of their nest has been documented at least since 2015. BE, p. 24

59.    The map of night roost locations for bald eagles is based on outdated data collected in 1990 and updated in 2010. This mapping effort ignores more recent reliable data and will result in insufficient protection for current roosting sites. The EA's analysis of impact on the bald eagle is tainted by this reliance on outdated data.

60.    The EA claims that current forests are unnaturally dense relative to historical forests in the Project area, but the Forest Service's own current forest survey data in the Project area as well as sources relied upon in the EA document the fact that current forests are substantially less dense than historical forests in the Project area, as detailed in John Muir Project's Objection. (JMP Objection, p. 4).

**CLAIM FOR RELIEF 2**

**(Failure to Take the Requisite "Hard Look" at Impacts)**

61.    NEPA requires agencies to take a "hard look" at environmental consequences before taking an action. <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332 (1989).

62.    In order to satisfy NEPA's "hard look" requirement, agencies need to consider all foreseeable direct and indirect impacts that the action poses, along with cumulative impacts that result from the proposed project together with other projects (past, present, or future). In determining an action's significance, the agency needs to analyze both the context and intensity of the action—including looking at short- and long-term effects as well as cumulative impacts. 40 C.F.R. § 1508.27.

63.    The EA fails to take a "hard look" at scientific evidence and arguments, advanced by Plaintiffs, which cast doubt on the veracity of a number of assumptions this Project is based on, particularly the assumption that fuel reduction by tree removal, i.e., thinning, will necessarily reduce the severity of forest fires and represents an effective way to protect adjacent human communities, and the assumption that current forests are denser than historical forests in the Project area. As set forth more fully below, comments of Plaintiff John Muir Project,

citing credible and recent studies, including research by Forest Service scientists, cast serious doubt on some of the most fundamental assumptions underlying the entire Project. The Forest Service's inadequate, dismissive, and cursory response to these comments demonstrates that the Forest Service failed to take the requisite hard look at this contrary evidence.

64.    The EA's analysis of direct, indirect, and cumulative impacts on famed resident bald eagles does not pass muster under the "hard look" standard.

- The BE at page 23 states that the duration of the limited operating period ("LOP") for the bald eagles will be determined based on whether eagles are spotted in the work area doing breeding and nesting behavior but fails to specify any qualifications or other specific guidelines as to how the "spotting" is to be accomplished. This omission is significant because bald eagles are known for being secretive and are therefore not easily spotted. Qualified individuals with specific expertise are needed. The EA did not take a "hard look" at the efficacy and feasibility of this mitigation measure.

- The BE at page 24 includes guidelines that direct the Service to "[a]void treatments in mapped bald eagle nest and night roost habitat **unless treatments are designed to improve habitat protection**," (emphasis added) but fails to define "improve habitat protection" in this context and does not set forth any criteria for evaluation of any proposed action. That guideline also provides that "[w]here that is not feasible to avoid treatments due to community protection measures or not desirable for habitat protection," other guidelines will be followed. However, other guidelines are inadequate and unreliable in part because they incorrectly claim that the "timing of nesting in the San Bernardino Mountains is not documented." (BE, p. 25). The nesting has been actively and widely documented since 2015 when the live stream camera was installed on the nest and all activities have been documented thoroughly on the Facebook page https://www.facebook.com/FOBBV and the YouTube channel https://www.youtube.com/c/FOBBVCAM. Accordingly, the guidelines must be revised in light of the

wealth of information that has been collected about the timing of bald eagle nesting in this area.

- The EA fails to evaluate the impact of removing all live trees less than 16 inches in diameter at breast height (DBH) from the eagle nesting area. There is evidence that removing trees between 8" and 16" can and will substantially affect the canopy cover, which is known to impact bald eagle nesting, yet the EA does not discuss the impact on the canopy cover and in turn, on the eagles. Ironically, the Response to Comments at page 4 acknowledges that forest canopy cover must be retained in bald eagle nest stands and night roosts but fails to acknowledge that the removal of trees up to 16 inches in diameter in these areas, which comprise the vast majority of the trees in the Project area (according to Figure 1 of the Silviculture Report), would result in the removal of most of the canopy, creating a fundamental and arbitrary inconsistency and conflict within the EA.

- The EA fails to evaluate the potential impacts on the bald eagle and other raptors that could result from the removal of trees up to 16" DBH.

- The BE notes that if removal of daytime perches would leave an area devoid of daytime perch sites, the loss of each perch tree will be mitigated by creating windows in green trees or installing artificial perches on a 2:1 basis. There is no data presented or in the record to show this mitigation would be effective in reducing the impact on Bald Eagles. In fact, this mitigation has been used previously in our valley. The perches were not maintained and fell within a few years of installation and bald eagles no longer utilize that area where the trees were cut down.

- The BE notes that the many rare species in the area will be severely impacted by the project activities and states harm cannot be avoided. For some species, such as Dammer's Blue Butterfly, the BE explains that the work in this species' habitat would be minimal, such as hand thinning, and claims that some of the trail work may be of benefit. This conclusion, however, is not supported by any

concrete evidence or analysis of the potential risk of harm

relative to any realistic long-term benefit to any of these

species. For other species with broader habitat range, the

BE states that the Project will "attempt to retain" habitat

(BE, p. 18) and again claims that some of the trail work

"may" be of benefit, but again fails to include any analysis

of the purported benefits of thinning in those areas or of

adding trails compared to the risk of direct harm to

sensitive species and their habitat.

## CLAIM FOR RELIEF 3

### (Improper Analysis of Conflicting Science)

65.    Accurate scientific analysis is essential to the NEPA process.

40 C.F.R. § 1500.1. NEPA requires agencies to disclose, analyze, and

make good faith response to contrary scientific opinions and studies.

66.    In their comments and objections to the proposed Project,

Plaintiffs argued that mechanical thinning, which includes widespread

removal of thousands of mature trees, could potentially increase, not

decrease, fire severity.

67.    This argument was based on citations to numerous scientific

studies that were submitted with the comments, including Forest

Service research. In their objections and comments, Plaintiff John Muir Project argued that the studies that the Forest Service relied on were outdated and biased to the extent that they were prepared on behalf of logging interests. During the objection period, Plaintiffs notified the Forest Service of additional scientific sources finding that thinning increases fire risk and effects, as well as a newly-published study, Baker et al. (2023) (https://www.mdpi.com/2571-6255/6/4/146), which critiqued Hagmann et al. (2021) (https://esajournals.onlinelibrary.wiley.com/doi/abs/10.1002/eap.2431), a Forest Service study the EA largely and fundamentally relies upon and cites with approval with regard to forest density, fire behavior, and thinning. Baker et al. (2023) meticulously documented the fact that Hagmann et al. (2021) represented a "falsification of the scientific record."

68.    The reliability and validity of the scientific papers on which Plaintiffs' arguments are based was recognized by the Ninth Circuit Court of Appeals in the <u>BARK v. United States Forest Service</u>, 958 F.3d 865, 869-871 (9th Cir. 2020).

69.    Referring to some of the scientific studies cited in Plaintiffs' comments and objections here, the Ninth Circuit found that the

plaintiffs in <u>BARK</u> had identified "considerable scientific evidence showing that variable density thinning will not achieve" the purpose of "reduc[ing] the risk of wildfires and promot[ing] safe fire-suppression activities." <u>BARK v. United States Forest Service</u>, 958 F.3d 865, 870 (9th Cir. 2020). Considering both context and intensity, as required by 40 C.F.R. § 1508.27, this evidence raises substantial questions about the Project's environmental impact, and an EIS is required." <u>BARK v. United States Forest Service</u>, 958 F.3d 865, 870 (9th Cir. 2020).

70.    The Court further found that "[s]ubstantial expert opinion presented by the Appellants during the administrative process disputes the USFS's conclusion that thinning is helpful for fire suppression and safety. For example, Oregon Wild pointed out in its EA comments that '[f]uel treatments have a modest effect on fire behavior, and could even make fire worse instead of better.' It averred that removing mature trees is especially likely to have a net negative effect on fire suppression. Importantly, the organization pointed to expert studies and research reviews that support this assertion." <u>BARK v. United States Forest Service</u>, 958 F.3d 865, 870 (9th Cir. 2020)

71.    The Court also cited with approval plaintiff BARK's assertion that "'reducing fuels does not consistently prevent large forest

fires, and seldom significantly reduces the outcome of these large fires,'

citing an article from Forest Ecology and Management. BARK also

directed the USFS to a recent study published in The Open Forest

Science Journal, which concluded that fuel treatments are unlikely to

reduce fire severity and consequent impacts, because often the treated

area is not affected by fire before the fuels return to normal levels."

BARK v. United States Forest Service, 958 F.3d 865, 870 (9th Cir.

2020).

72.    BARK further noted that, while "BARK discussed [during

the scoping process] the studies that have found that fuel reduction may

actually exacerbate fire severity in some cases as such projects leave

behind combustible slash, open the forest canopy to create more ground-

level biomass, and increase solar radiation which dries out the

understory[,] [t]he EA did not discuss this information." BARK v.

United States Forest Service, 958 F.3d 865, 871 (9th Cir. 2020).

73.    NEPA requires agencies to disclose, analyze, and make good

faith responses to considered contrary scientific opinions, but the Forest

Service failed to make a good faith response to the contrary scientific

opinions cited by Plaintiffs. The Forest Service's failure to analyze the

newer conflicting science cited by Plaintiffs was arbitrary, capricious, or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM FOR RELIEF 4

## (Improper Denial of Scientific Controversy)

74.     One of the factors the Forest Service was required to consider is "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27.

75.     Instead of acknowledging and meaningfully addressing the scientific controversy surrounding the effects of widespread tree removal on wildfires and providing a good faith analysis of the opposing views, the Forest Service denied the existence of any controversy whatsoever. In this regard, the DN/FONSI, on p. 11, claimed "[t]here is no known credible scientific controversy over the impacts of the proposed action, and the scoping has not raised substantive scientific controversy related to the effects of the proposed project on the human environment."

76.     Regarding the studies cited by Plaintiffs in their comments and objections, the DN/FONSI merely states that "some stakeholders asserted …. there is significant scientific dispute regarding the efficacy of forest thinning and prescribed burning in reducing fire hazard.

However, the overwhelming body of science supports the analysis and conclusions in the EA …. And the contrary opinion does not rise to the level of a credible scientific dispute indicating substantial controversy or uncertainty." DN/FONSI, p. 11. These arguments and contentions are disingenuous at best, and directly contradict <u>BARK v. United States Forest Service</u>, 958 F.3d 865 (9th Cir. 2020), which reached the opposite conclusion. Similarly, the DN/FONSI, on p. 10, dismissed the threat this Project poses to public safety from increased wildfire severity due to thinning, and the risk of prescribed fire escapes, claiming the following: "There will be no significant effects on public health and safety."

## CLAIM FOR RELIEF 5

### (Improper Assessment of a Finding of No Significant Impact)

77.    A FONSI can be prepared if the Defendants determine on the basis of the EA that an EIS is not required because there will be no significant effects to the human environment from the proposed action. 40 C.F.R. § 1501.4(e).

78.    The DN/FONSI prepared in this case was improper because the EA on which it was based was plainly inadequate and did not provide sufficient support for a finding of no significant impact as a

result of the Defendants' action. Defendants' DN/FONSI and the conclusions on which it was based were arbitrary, capricious, or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## CLAIM FOR RELIEF 6

### (Failure to Prepare an EIS)

79.    NEPA requires that Defendants prepare an EIS "in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also*, 40 C.F.R. § 1502.3. These agencies must complete an EIS if (1) the proposed project "is a major federal action" and (2) the proposed project may "significantly affect the quality of the human environment." 42 U.S.C. § 4332; *see also,* 40 C.F.R. § 1508.18.

80.    Although NEPA regulations allow an agency to avoid initially preparing a complete EIS by first preparing an EA and then issuing a FONSI, if appropriate (40 C.F.R. § 1508.9), the inadequate EA and underlying record here do not support the Defendants' DN/FONSI and failure to prepare an EIS.

81.    Given the impacts that the Project may have on the human environment, including the safety of adjacent communities, impacts to

protected species, as well as the inadequacy and inaccuracy of the EA, Defendants' failure to prepare an EIS was arbitrary, capricious, or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment:

    a. Declaring that the Forest Service's DN/FONSI for the Project violates NEPA, and is arbitrary, capricious, or not in accordance with law under the APA, 5 U.S.C. § 706(2)(A);

    b. Vacating and setting aside the USFS's DN/FONSI for the Project as an illegal agency action under the APA;

    c. Permanently enjoining the Forest Service from implementing the Project unless and until the agency complies with NEPA;

    d. Entering appropriate injunctive relief to ensure that Defendants comply with NEPA, and specifically to ensure that Defendants and their agents take no further actions toward proceeding with the challenged Project unless and until they have complied with NEPA;

e.  Awarding Plaintiff its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.  Awarding such further relief as the Court deems just and equitable.

Respectfully submitted this 10th day of August, 2023.

*Babak Naficy*

Babak Naficy
*Attorney for Plaintiffs*

COMPLAINT FOR VACATUR, INJUNCTIVE, AND DECLARATORY RELIEF - 43